Magill, Appellant, *v.* Westinghouse Electric Company, Appellant.

Argued September 12, 1966. Before ERVIN, P. J.,
WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN,
and SPAULDING, JJ.

*William J. MacDermott,* with him *David Cohen,* for
claimant.

*Robert A. Detweiler,* for employer.

OPINION BY WATKINS, J., March 23, 1967:

This is an appeal by the employer from the order of
the Court of Common Pleas No. 5 of Philadelphia Coun-
ty, affirming the decision of the Workmen's Compensa-
tion Board's award of benefits for occupational disease
benefits to the claimant's decedent and his widow; and
an appeal by the claimant from the order of the court
affirming the Workmen's Compensation Board in al-
lowing credits to the employee as the result of insurance
payments.

This appeal of the employer is based on the conten-
tion that there was not sufficient competent medical

testimony to support the board's finding that the claimant's decedent's cirrhosis of the liver was aggravated by exposure to carbon tetrachloride in the course of his employment.

Claimant's decedent, Walter J. Magill, worked for Westinghouse Electric Corporation in various jobs from July 8, 1948 to January 29, 1957. He worked on various shifts as a turret lathe operator in "E" building from July 8, 1948 to September 1954, with a few months in building "A-31". He worked there as a machine helper to October 1956 when he was transferred to Dept. 7424 the "light shop" where he operated a turret lathe until his separation from work. With time off during the strike from October 15, 1955, until October 8, 1956. Claimant's decedent died on April 27, 1957, of portal cirrhosis.

The testimony indicates that in "E" building and the light shop during the time claimant's decedent worked in these buildings there was uncontrolled use of carbon tetrachloride for cleaning small pieces of parts being produced; to clean clothes; shoes, metal parts being produced to obtain a certain finish, etc. That it was applied either by spraying or with a paint brush. That the odor of evaporating carbon tetrachloride was constantly in the air and that complaints were made to the supervisors and after a survey by the company, after claimant's decedent's separation from work, the use of carbon tetrachloride was entirely discontinued by the company.

This situation was partly corroborated by the employer's witnesses in that one stated the odor of carbon tetrachloride was noticeable in the air, and that taking of carbon tetrachloride by employees became so intolerable it was placed under lock and key as a protective measure.

It is agreed that the danger level for humans is 25 parts of carbon tetrachloride to 1 million parts of

air in the atmosphere being breathed. For one to detect the odor of carbon tetrachloride in the air there would have to be close to 100 parts carbon tetrachloride to 1 million parts of air.

Claimant's medical testimony was as follows:

"Dr. Heinrich Brieger, teacher of occupational medicine and hygiene at Jefferson Medical College, testified that on the basis of the hospital records and the testimony of Evelyn Alexander, Asenath W. Magill, Marlene Schmehl, John Hewitt, Stephen Haynych and Stephen Nowrecki, he is reasonably certain that exposure to carbon tetrachloride had aggravated and accelerated the disease from which Mr. Magill died. The carbon tetrachloride had an adverse affect upon the claimant's liver. Dr. Brieger's opinion was based upon the following: (a) His vast experience that an already diseased liver is more susceptible to effects of carbon tetrachloride and other liver poisonings than the normal non-diseased liver; (b) the testimony of the claimant's co-workers showed that the claimant's liver was exposed to concentrations of carbon tetrachloride high enough at least to present a hazard to the liver and other organs; (c) the removal of the claimant from the contaminated atmosphere during the years 1955-1956 which temporarily abated his physical symptoms and his subsequent deterioration and demise in February of 1957 upon returning to work. Also included in Dr. Brieger's opinion was a careful scrutiny of the autopsy findings and microscopic findings."

The referee awarded compensation to the claimant with credits to the defendant for payments made to claimant's decedent and medical and hospital payments by the Metropolitan Life Insurance Company under a group social insurance contract with the employer for noncompensable injury or illness, and prorated the payments between the employer, defendant and the Commonwealth of Pennsylvania, Department of Labor

& Industry. The Workmen's Compensation Board and the court below affirmed the award.

"As the award of the compensation authorities was in favor of the claimant the question before the court below and before this Court is well stated in Crandall v. Downington Iron Wks., 188 Pa. Superior Ct. 1, at page 4, 146 A. 2d 312 (1958), as follows: 'The statute under consideration is to be liberally construed in favor of the employe: Roschak v. Vulcan Iron Wks., 157 Pa. Superior Ct. 227, 42 A. 2d 280. Our function is to determine whether or not there is substantial evidence to support the findings of the compensation authorities, giving to the claimant, who has the award, the benefit of the most favorable inferences reasonably deducible from the testimony: Masouskie v. Hammond Coal Co., 172 Pa. Superior Ct. 409, 94 A. 2d 55.' See also: Busfield Unemployment Compensation Case, 191 Pa. Superior Ct. 43, 155 A. 2d 436 (1959).

"It is the prerogative of workmen's compensation authorities and not the court to weigh testimony of witnesses and to accept or reject it either in whole or in part. Smith v. Pull. Stand. Car Mfg. Co., 194 Pa. Superior Ct. 263, 166 A. 2d 299 (1960). The credibility of those qualified as medical experts is not reviewable as a matter of law and the credibility of witnesses is always for the finders of fact. Bednar v. Westinghouse Elec. Corp., 194 Pa. Superior Ct. 10, 166 A. 2d 305 (1960)." The record sufficiently discloses a causal chain of events and the medical opinion was based on the whole record and is expressed as a reasonable certainty.

The question as to credits depends on proof of insurance payments being in lieu of compensation by the contract of insurance or by proof and a finding of subrogation from the evidence. The Occupational Disease Act of 1939, June 21, P.L. 566, §319, as amended, 77 PS §1419, is as follows:

"Where the compensable disability is caused in whole or in part by the act or omission of a third party, the employer shall be subrogated to the right of the employe, his personal representative, his estate or his dependents, against such third party for the balance of any sum recovered in litigation, or paid in compromise settlement, after subtraction of reasonable attorney's fees and other proper disbursements, but only to the extent of the compensation payable under this article by the employer. Any recovery against such third person in excess of the compensation theretofore paid by the employer shall be paid forthwith to the employe or to the dependents, and shall be treated as an advance payment by the employer on account of any future instalments of compensation.

"Where an employe has received payments for the disability or medical expense resulting from a disability in the course of his employment, paid by the employer or an insurance company on the basis that the disability was not compensable under this act, in the event of an agreement or award for that disability, the employer or insurance company, who made the payments, shall be subrogated out of the agreement or award to the amount so paid, if the right to subrogation is agreed to by the parties or is established at the time of hearing before the referee or the board."

The record indicates that the group social insurance contract provided that: "Under the terms of our insurance plan we will pay weekly sickness and accident benefits when an employee is disabled because of illness or injury of a non-occupational nature."

That the premiums were paid partly by the employee and the company, and the contribution by the company was determined in part by the number of claims paid by the insurance carrier during the year, chargeable to this group account; and that should a claimant be paid under the social insurance policy and subsequently

the illness or injury be determined to be compensable and an award made, the insurance company is entitled to be subrogated out of the award to the amount paid.

This is the normal content and intent of such group social insurance contracts and is the exact situation covered by the Act. The record establishes the right to subrogation. The Act itself makes no provision for varying premium paying arrangements nor any distinction as to who ultimately receives the award, the employee or those who succeed to his rights.

The interpretation given to the Act by the Board and the court below seems to be the only reasonable one and was as follows:

"Paragraph one is the standard subrogation clause similarly stated under Section 671 of the Workmen's Compensation Act. Paragraph two broadens the employer's subrogation rights to include those instances in which the employer (or insurance company) has made payments for disability not compensable under the act irrespective of acts or omissions of third parties. The fact that the claimant paid part of the premiums during his lifetime is immaterial. Paragraph two only refers to the payment of proceeds, the theory seeming to be that in the event the supposedly non-occupational disease is found at a subsequent time to be compensable under the Act, the employee will not be the recipient of double benefits.

"To hold that no right of subrogation exists against decedent's wife or child would be incongruous.

"Paragraph one of Section 319 specifically provides for subrogation rights against the employee's dependents. To hold that the right of subrogation does not similarly apply to paragraph two would lead to an absurd result, namely, if the disability does not cause the employee's demise, the employer has a right of subrogation, but if the disability is fatal, there is no subrogation rights against the wife and child. The

rights of the employee's dependents arise through the employee. The right of recovery depends solely upon the employee's right of recovery. His right of recovery is limited by subrogation in certain instances. So are his dependents."

Order affirmed.